**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

HITCH ENTERPRISES, INC.,  )
on behalf of itself  )
and all others similarly situated,  )
 )
      Plaintiff/Petitioner  )
 )      No. 6:18-cv-01030-EFM-KGG
v.  )
 )
OXY USA Inc.,  )
 )
      Defendant/Respondent  )

**DEFENDANT OXY USA INC.'S RESPONSE TO PLAINTIFF'S MOTION AND
MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION AND OBJECTIONS TO
DECLARATION OF REX SHARP AND MOTION TO STRIKE
<u>EXPERT REPORT OF DANIEL REINEKE</u>**

Defendant Oxy USA Inc. ("Oxy") files this response in opposition to Plaintiff's Motion and Memorandum in Support of Class Certification ("Plaintiff's Motion").

## I. <u>Introduction</u>

Plaintiff's Motion must be denied. As a preliminary matter, Plaintiff's Motion significantly understates the "rigorous analysis" that this Court must apply and the standard that Plaintiff must meet in order to certify a class. Plaintiff also misstates or ignores a number of key facts that impact the issue of class certification. These includes the facts that for some of the wells at issue (including Plaintiff's wells), gas from those wells is sold under third-party contracts or otherwise used at or near the well—a fact that creates significant differences among the proposed Class members and that requires a different analysis and different evidence for individual owners. Plaintiff also misstates the facts of the settlement in *Littell v. OXY*, Case No. 98-CV-51 (Kan. Dist. Ct. Stevens Cty.) ("*Littell*"), which addressed deductions for gathering costs but did not address other deductions. Plaintiff further misstates Kansas law on the substantive issues in this case,

including the Kansas Supreme Court's holding in *Fawcett v. Oil Producers, Inc. of Kansas*, 302 Kan. 350 (2015). Contrary to Plaintiff's contention, *Fawcett* did not make the question of when gas reaches marketable condition irrelevant. The court in *Fawcett* held that, once gas is sold, it is conclusively in marketable condition, but *Fawcett* did not overrule prior longstanding case law that other factors can also demonstrate marketable condition.

Plaintiff's evidence falls far short of meeting the requirements of Rule 23; in fact, Plaintiff's Motion presents virtually no evidence to meet the requirements of the rule. The reality is that Plaintiff cannot meet its burden under Rule 23. Among other things, Plaintiff cannot satisfy the commonality and typicality requirements of Rule 23(a). Under *Fawcett*, liability in this case depends on the facts of the sale and marketing of gas and other products from individual wells and the language in individual leases, neither of which is uniform across the proposed Class. In fact, Plaintiff's lease contains language that differs from other leases in the proposed Class in material ways, and Oxy sold and marketed gas from Plaintiff's wells differently and at different points than gas from many Class members' wells. Each of these points is critical to the resolution of individual Class members' claims and will require testimony and evidence specific to individual Class members. For these reasons and the others discussed below, Oxy respectfully requests that the Court deny Plaintiff's Motion.

## II. **Factual Background**

Plaintiff seeks to certify a class (the "Class") consisting of the following individuals, with a few exceptions:

> All royalty owners in Kansas wells: (a) where OXY USA, Inc. was the operator (or as a non-operator, separately marketed gas); (b) who were paid royalties for production of gas, NGLs, or Helium from July 1, 2007 to April 30, 2014; and whose gas was moved over the ONEOK/West Texas Gas/NNG lines to the Jayhawk Plant for processing.

Plaintiff seeks to except the Office of Natural Resources Revenue, presiding judges and immediate family, OXY and its related persons and entities, any publicly traded entity that is involved in gas production, gathering, processing, or marketing, and royalty owners whose leases included an express deduction clause.

Oxy was the operator of over 600 wells in the Hugoton Field that are within the definition of the proposed Class (the "Class Wells"). Exhibit B, Report of Stephen Becker, at ¶ 15. Some of the Class Wells were gas-only wells, and some were oil wells that also produced gas. Exhibit B, Expert Report of Stephen L. Becker, at ¶ 40. Oxy sold these assets to Merit Energy effective January 1, 2014. Exhibit C, Decl. of David Bushnell at ¶ 3, Ex. 1.

Before the sale to Merit, and during the period relevant to the Class, Oxy sold some of the gas from some of the Class Wells, including from some of Plaintiff's wells, at the well under third-party contracts for use in irrigation operations (the "Irrigation Contracts"). Exhibit C, Bushnell Decl. ¶ 4, Ex. 2; Exhibit A, McBeath Report, at 15-18. The third-party purchasers under the Irrigation Contracts accepted the gas in its condition at the well. In addition, Oxy supplied some of the gas produced from some of the Class Wells to landowners and others via house taps or gas taps for use in heating and other purposes ("House/Gas Tap Gas"). Exhibit A, McBeath Report, at 28. As with the Irrigation Contracts, at least some of the House/Gas Tap Gas was supplied "as is" at or near the wellhead. In addition, many of the pumping units on the wells were, in the past, driven by gas-fired engines using natural gas directly from the well, and gas directly from the well also powered system compressors and lease separation equipment. *Id*. at 28. It is important to note that Plaintiff's Motion completely ignores the gas sold under the Irrigation Contracts and the House/Gas Tap Gas as well as the unprocessed gas used to fuel field equipment.

Oxy delivered the majority of the gas produced from the Class Wells to the Jayhawk Plant for processing to extract natural gas liquids ("NGLs"), crude helium, and residue gas, pursuant to a May 5, 2006 Gas Processing Agreement between BP America Production Company and Oxy ("Processing Agreement").  Decl. of Rex Sharp (Pl.'s Ex. B) ¶ 5, Ex. 5; Exhibit B, Becker Report, at ¶ 14.  For these services, Oxy paid the third-party processor a Power Fee and a Variable Fee per Mcf of wet gas.  Decl. of Rex Sharp (Pl.'s Ex. B) ¶ 5, Ex. 5; Exhibit B, Becker Report, at ¶ 17.

With respect to the gas processed at the Jayhawk Plant, Oxy sold the residue gas to Occidental Energy Marketing Inc. ("OEMI"), an affiliate, through a long-term master sales contract.  Under the Oxy/OEMI contract, OEMI paid Oxy an established interstate pipeline index price (the Southern Star Index Price) at the tailgate of the Jayhawk Plant (the "Index Price").  Decl. of Rex Sharp (Pl.'s Ex. B) ¶ 7, Ex. 7; Exhibit B, Becker Report, at ¶ 20.  OEMI and Oxy agreed that "[i]t is the intent of the Parties that the Delivery Point(s), and the corresponding Index Point(s) set forth on Exhibit 'A', reflect active, liquid markets for the sale and purchase of natural Gas among and between non-affiliated buyers and sellers of natural Gas on terms similar to those set forth herein."  Decl. of Rex Sharp (Pl.'s Ex. B) ¶ 7, Ex. 7 (Master Gas Sales & Purchase Agreement § 4.3).  Oxy paid royalties based on the Index Price it received.  Exhibit B, Becker Report, at ¶ 28. OEMI sold the residue gas purchased from Oxy, along with gas purchased from others, to third parties, primarily on the spot market.  Over the period from July 2007 through January 1, 2014, when Oxy sold the Class Leases and Class Wells to Merit Energy, the Index Price and the weighted average sales price obtained by OEMI in its third-party sales (the "OEMI WASP") were nearly

the same, with the Index Price higher in some months, the OEMI WASP higher in others, and the Index Price and the OEMI WASP the same in many months.  Exhibit B, Becker Report, at ¶ 70.[1]

Oxy sold the NGLs to third parties, with OEMI marketing the NGLs for Oxy.  OEMI passed through the proceeds of these third-party sales to Oxy for an administrative fee.  Exhibit B, Becker Report, at ¶ 21 & n.24.  Oxy paid royalties based on the proceeds of these third-party NGL sales and did not deduct the administrative fee from the NGL price in calculating and paying royalties.  *Id*. at 29.  Similarly, Oxy sold the helium to Oneok Field Services Company, LLC.  *Id*. at 21.  Oxy paid royalties on the proceeds it received from Oneok.  *Id*. at 29.

In general, Oxy's ability to take deductions for gathering charges is governed by the settlement in *Littell,* but contrary to Plaintiff's assertions, the *Littell* settlement did not bar the types of deductions for processing fees at issue in this case.  In fact, the Notice of Proposed Settlement in *Littell* explicitly stated:

> Nothing contained in the Settlement Agreement is intended to alter or restrict OXY's ongoing practice of charging the accounts of its royalty owners with a pro-rata share of the fees and costs which it incurs to process the gas in a processing plant and to transport it on mainline transmission pipelines under approved FERC tariffs, so long as such royalty owners continue to receive the benefits of such activities in the form of their allocated share of the proceeds of sale received by OXY for the natural gas liquids, helium or other extracted products and the residue gas which is sold after such transportation and processing occur.

*See* Exhibit D, Notice of Proposed Settlement of Class Action.

There are approximately 631 leases covering the Class Wells (the "Class Leases").  Pl.'s M. ¶ 7.  As this Court knows,

> Under Kansas law, oil and gas leases generally fall within three types: (1) proceeds; (2) market value; and (3) *Waechter*. Under a proceeds lease, the lessee pays the royalty owner a share of the actual monies received from the sale of the gas.  Under a market

---

[1]      Plaintiff seeks the higher of the WASP or Index Price each month, even though its lease contains no language entitling Plaintiff to that amount, and even though Plaintiff appears to concede in its Petition that the Index Price is a market price.  Pet. ¶ 17(b).

> value lease, royalty payments are based on the price that would be paid by a willing buyer to a willing seller in a free market. A *Waechter* lease is a hybrid of a proceeds and market value lease; "royalties are calculated based on either proceeds or market value, depending on the location where gas is sold."

*Roco, Inc. v. EOG Res., Inc.*, 14-1065-JAR-TJJ, 2016 WL 6610896, at *15 (D. Kan. Nov. 9, 2016) (internal citations omitted). This case involves all three lease types, and within those general types, there are significant variations (such as whether proceeds are gross or net, or unspecified).

Plaintiff's Motion included as an exhibit a chart of lease forms. Exhibit E to this Response is Plaintiff's chart with additional columns identifying the lease type and whether the lease requires payment on gas produced, gas sold, and/or gas used. As the chart shows, the lease type and volume payment provisions vary extensively across the Class Leases. Plaintiff's leases, the 1938 and 1943 Henry C. Hitch and Christina W. Hitch leases attached as Exhibit 1 and 2 to the Declaration of Jason Hitch of Hitch Enterprises (Pl.'s Ex. A), are proceeds leases, although the 1943 lease specifies that the proceeds are measured "at the mouth of the well," while the 1938 lease is silent. *See* Exhibit B, Becker Report, at ¶¶ 34-35. There are approximately 311 *Waechter* leases across the proposed Class, compared to about 293 proceeds and 20 market value leases.[2] As discussed in Section IV below, the analysis for liability under proceeds leases and market value or *Waechter* leases varies significantly, particularly in a case like this where the gas is marketed or used at different points and locations.

The lease types captured in Exhibit E only reflect lease language for royalties on gas from gas-only wells. Several wells among the Class Wells are oil wells that also produce gas. For these mixed oil/gas wells, most of the Class Leases have a separate royalty provision with different

---

[2] Examples of market value and proceeds leases are attached as Exhibit F. Across the proposed Class, there are at least 23 different lease forms containing a variety of royalty payment standards. *See* Exhibit B, Becker Report at ¶ 33.

payment provisions.  For example, one of Plaintiff's leases is a proceeds lease for gas-only wells, but if the well is a mixed oil/gas well, the lessee owes the lessor a percentage of the market value of the gas for gas used by the lessee but a percentage of proceeds if the gas is sold (whether at the well or not, which is different from a *Waechter* lease).

### III. Legal Standard for Class Certification

By rule, Plaintiff must show that "(1) [t]he class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).  In addition, Plaintiff must show "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

"In deciding whether to certify a class, the Court must perform a 'rigorous analysis' of whether the proposed class satisfies the requirements of Rule 23." *Swisher v. United States*, 189 F.R.D. 638, 640 (D. Kan. 1999).  [T]his 'rigorous analysis' will frequently 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Rodriquez v. Hermes Landscaping, Inc*., 17-2142, 2018 WL 4257712, at *2 (D. Kan. Sept. 5, 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).  Plaintiff "must demonstrate, under a strict burden of **proof**, that all of the requirements of 23(a) are clearly met." *Rex v. Owens ex rel. State of Okla*., 585 F.2d 432, 435 (10th Cir. 1978) (emphasis added).  Plaintiff may not merely present declarations and ask the Court to resolve all factual disputes on the class certification factors in Plaintiff's favor; Plaintiff must actually prove, with evidence, each element of Rules 23(a) and (b).  *See, e.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (requiring evidentiary proof of Rule 23 elements); *Rex*, 585 F.2d

at 436 (requiring evidence, not just allegations, of Rule 23 factors). Where a plaintiff puts forth proposed class-wide evidence, the court must engage in "some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case. If class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and render it unsuitable for class-wide adjudication." *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 304–05 (3d Cir. 2016).

Of particular relevance to this case is the standard for predominance, and what is an individualized question versus a common question. Plaintiff cites *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) in support of its theory that a question is only an individual question if individual class members must testify or provide documents from their own files. The Court in *Tyson* explained: "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" The Court there considered the issue of whether a single representative sample of certain data could be used by all class members to prove an element of their claims, and it found that this was possible on the facts of the particular case. *Id*. at 1049. Put another way, each class member, if trying their cases individually, would have been able to present the same exact data sample. *Id*. As the *Tyson* Court explained, if, in individual cases, the class members would not be able to use the identical evidence, that evidence cannot be used classwide, because that would give the parties different rights in a class action than in individual actions. *Id*. at 1048.

Contrary to Plaintiff's assertions, the *Tyson* Court did not hold that a question is only individual if the class members themselves must testify; the question is whether the evidence is

particular to each class member, or whether the same evidence applies to each class member equally.  This Court, in *Blair v. TransAm Trucking, Inc*., 309 F. Supp. 3d 977, 1012 (D. Kan. 2018), explained that mathematical calculations do not automatically lead to a common question. If the math must be applied individually to each class member's particular facts, the math is not common evidence supporting a common question.  *Id*.  ("However, as Plaintiffs have themselves suggested, this mathematical exercise must be applied individually for each Leased Driver based on the date that they filed their consent to join. And, as one would expect, the 1,928 Leased Drivers did not file their consents on the same date. This also weighs in favor of decertification.").  *Blair* did not involve plaintiff testimony, but individual calculation, presumably by an expert.  Likewise, in *Gonzalez v. Corning*, 885 F.3d 186, 199 (3d Cir. 2018), *as amended* (Apr. 4, 2018), the Third Circuit denied class certification because individualized evidence in the form of inspection of individual shingles for defects (not testimony by class members) was required.

## IV. <u>Argument and Authorities</u>

A.    ***Fawcett*** **did not change long-standing Kansas law that gas can be in marketable condition before an actual sale.**

Plaintiff's theories of commonality, which underpin all of Plaintiff's arguments in favor of class certification, are based on a mischaracterization of the Kansas Supreme Court's holding in *Fawcett*.  Plaintiff argues that certification is proper under *Fawcett* because (1) as in *Fawcett*, all of the Class Leases contain an implied duty to market, which Plaintiff claims creates a common legal question that, by itself, is sufficient to support certification; and (2) *Fawcett* changed Kansas law such that gas quality and "marketable condition" are no longer relevant and, instead, the relevant question for determining liability is whether the gas was sold in a "good-faith sale."  As discussed below, Plaintiff's representation of *Fawcett* is clearly wrong.  The Kansas Supreme Court decided *Fawcett* on summary judgment, not on class certification, and the court did not

replace the "marketable condition" standard with an analysis of whether the operator sold the gas in a good-faith sale. In fact, whether a sale was in good faith was not even at issue in *Fawcett*. *Fawcett*, 302 Kan. at 366. *Fawcett* simply held that the operator's "duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point [of an indisputably good-faith sale] to post-sale expenses." *Id*. at 365.

In *Fawcett*, the operator sold all the gas at issue at the wellhead in a third-party sale. *Id*. at 353. The question in *Fawcett* was whether royalties could be calculated on the net price the operator received from the purchaser, or whether the operator had to add back in deductions the purchaser took for various post-sale processing activities. *Id*. at 353 – 54. The court held that, where only wellhead sales were at issue, the answer to this question would be the same for all three lease types: for wellhead sales, the lessee pays on the proceeds of the actual sale (for proceeds and *Waechter* leases) or on the market value at the well, which is established by an actual wellhead sale (for market value leases). *Id*. at 354. The court did not address whether the analysis would differ among lease types where the lessee sold the gas downstream rather than at the wellhead.

In answering the question, the court explained that the operator has an implied duty to put the gas into marketable condition at its own cost. *Id*. at 361.

> [W]hen gas is sold at the well it has been marketed; and when the operator is required to pay royalty *on its proceeds from such sales*, the operator may not deduct any pre-sale expenses required to make the gas acceptable to the third-party purchaser . . . . *But post-sale, post-production expenses to fractionate raw natural gas into its various valuable components or transform it into interstate pipeline quality gas are different than expenses of drilling and equipping the well or delivering the gas to the purchaser*." *Id*. at 364 (emphasis added; internal citation omitted).

*Id*. at 364. Accordingly, the *Fawcett* court held: "when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, *and the gas is sold at the well*, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond

that geographical point to post-sale expenses. In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction." *Id*. at 365 (emphasis added). Plaintiff is correct that, once a good-faith sale occurs, the operator has met its duty to market and duty to put the gas in marketable condition as a matter of law. But *Fawcett* does not speak to whether and under what circumstances gas becomes marketable *before* an actual sale. Although the gas is unquestionably marketable when it has actually been sold in a good-faith transaction, "[w]hat it means to be 'marketable' remains an open question." *Fawcett*, 302 Kan. at 363. "Such a determination turns on facts and circumstances, like where the gas is sold *and what the specific terms of the oil and gas lease require*." *Roderick v. XTO Energy, Inc*., 08-1330-EFM-GEB, 2016 WL 4039641, at *15 (D. Kan. July 28, 2016) (emphasis added). Gas can be in marketable condition before the point at which the operator actually sells it. *See Sternberger v. Marathon Oil Co*., 257 Kan. 315, 331 (1995) (recognizing that gas can be in marketable condition at the wellhead even if it is not actually sold there).

**B.      Some of the gas from the Class Wells was sold or used at the wellhead, which demonstrates marketability of all gas from those wells.**

Here, as Plaintiff acknowledges, the majority of the gas from the Class Wells was sold downstream of the wellhead. But at least some of the gas was marketable at a point well before the sale and, in fact, some of the gas from the Class Wells was sold or used at or near the well under the Irrigation Contracts and in the form of the House/Gas Tap Gas. Oxy sold it further downstream to maximize revenue—both for Oxy and for Plaintiff—but at least for some Class Wells, Oxy could have sold (and in fact did sell some of) the gas in its wellhead condition. The Kansas Supreme Court has found that sales of even part of the gas stream under irrigation contracts

and the use of gas via house or gas taps indicate that all of the gas from that well is marketable at that point:

> The drawing indicates that some of the gas leaves the well site in a line designated "free house gas," suggesting that the gas at the well site is in a marketable condition for household use.  Likewise, the drawing shows that, after the gas has been metered into the gathering system but before it gets to the processing plants, a pipeline labeled "irrig. sales" exits the system, suggesting that the gas is in marketable condition for use in irrigation systems before it is in a condition to enter the interstate transmission pipeline.

*Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 365 (2013).  Because at least some of the gas was sold under these Irrigation Contracts and used via House/Gas Taps and for field equipment, demonstrating that it was in fact marketable and saleable at an earlier point than the majority of the downstream sales, the Court must look at the particular gas from each well to determine when it was marketable.[3]  As one example, a "house tap" directly from the Tucker A-1 well fuels the Liberal Country Club in Liberal, Kansas, just as if it were connected to a municipal gas utility.  Exhibit A, McBeath Report, at 11.  Where unprocessed gas is used to power equipment and for domestic purposes, it has the same function and use as gas delivered from an interstate pipeline or local utility.  *Id*. at 27.  Marketability will require a well-by-well and owner-by-owner analysis, meaning that commonality is not met in this case—if gas from a particular well was marketable before it was processed, Oxy had a right to deduct a proportionate share of those processing fees from that Class member's royalties, even under leases with the implied duty to market.  Notably, Plaintiff has not submitted any evidence on marketability or offered any expert opinions demonstrating the type of evidence that would be needed to show where gas from any Class Well was marketable.  Plaintiff has failed to demonstrate that where gas from each Class

---

[3]     Plaintiff acknowledges in its Petition that this Court will have to resolve the issues of the quality of the gas, the location of completed sales, and the market for gas.  Am. Pet. ¶ 34(b)(i-iii).

Well became marketable—a fact that determines whether Oxy's deductions were proper or not—can be determined on a class-wide basis without individualized evidence.

### C.   *Fawcett* did not address sales downstream from the wellhead under proceeds leases.

*Fawcett* also only addresses the situation in which royalties are to be paid on the proceeds of wellhead sales.  It does not speak to the proper payment of royalties on a *Waechter* or market value lease when the sale occurs at a downstream location; in that situation, royalties are paid on the market value of the gas (usually but not always determined at the wellhead), not proceeds of the first sale.  The court in *Waechter* emphasized the difference between "proceeds" and "market value":

> Proceeds ordinarily refer to the money obtained by an actual sale. This connotation is not without significance in the gas business. Where the sale is at the wellhead the lessor does not consent to the uncertainties of what the market or fair value or price of the gas may be-he is willing to take what the lessee sells it for, relying on the lessee's self-interest in obtaining the best price possible. Under the usual lease for every dollar the lessor receives the lessee receives seven. Where sale is off the leased premises market value at the well comes into play in determining royalty but other factors also may play a part in determining the parties' intention, such as items of expense away from the wellhead, other sales and the like, in determining just what that market value is. In such situation there is no real sale at the wellhead from which proceeds are derived.

*Waechter v. Amoco Prod. Co.*, 217 Kan. 489, 512 (1975), adhered to, 219 Kan. 41 (1976); *see also Fawcett*, 302 Kan. at 359.

If the lease is a proceeds lease, royalties must be paid on the *actual proceeds*, regardless of the market value of the gas at the wellhead.  Here, for the majority of the gas (although not for the gas sold under the Irrigation Contracts) that would be the proceeds of a downstream (not wellhead) sale.  According to *Fawcett*, this must be a good-faith sale, so for proceeds leases, Plaintiff is correct that the question of whether Oxy sold the gas in good-faith sales is relevant.  In contrast, if

the lease is a *Waechter* lease and the gas is sold downstream of the well, or if the lease is a market value lease, royalties must be paid based on the *market value of the gas* (usually determined at the wellhead), regardless of the actual price obtained or the conditions of the actual sale (although the actual price obtained and actual sale conditions may be evidence of market value).

Here, because the majority of the sales of the gas (except for the sales under Irrigation Contracts) were downstream of the wellhead, the market value of the gas at the wellhead may or may not be the same as the actual proceeds Oxy received in the downstream sale. It is impossible to say that, as a matter of law, proceeds, market value, and *Waechter* leases can all be analyzed in the same way, with the same facts, when the operator sold much of the gas downstream rather than at the wellhead. In addition to these complexities, there is an added layer of analysis required because not all the Class Wells are gas-only wells. Determining the proper royalty will also require an analysis of whether the well is gas-only or mixed oil and gas, and if it is a mixed oil and gas well, applying the separate royalty provisions applicable to those well types. For example, on one of Plaintiff's leases, the royalty for gas from a mixed well is a percentage of market value for gas used and a percentage of proceeds for gas sold, whether the gas is sold at the wellhead or off-premises. Hitch Decl. Ex. 1 (Pl.'s Ex. A). This language differs from *Waechter* language because the proceeds calculation applies to any gas sold, whether at the wellhead or not, and the gas sold must be split out from the gas used. These circumstances require an owner-by-owner, well-by-well analysis of both "good-faith sale" and marketable condition, as well as a lease-by-lease analysis of payment obligations.

### D. Plaintiff has failed to identify meaningful common questions of law or fact.

On the issue of commonality, Plaintiff has alleged that the following four questions are questions of law or fact common to each Class member:

(a)     Whether Plaintiff and the Class are the beneficiaries of an implied duty to market.

(b)     Whether pre-sale fuel and processing costs (in cash or in kind) were deducted from royalties.

(c)     Whether OXY (including any of its affiliates) paid royalty to Plaintiff and the Class based on a starting price below what OXY or its affiliates received in arm's-length sales transactions.

(d)     Whether OXY failed to fully reimburse the royalty owners for wrongfully withheld Conservation Fees by omitting 10% interest under K.S.A. 60-201.

Pl.'s M. for Class Cert. at 14.  To prove commonality, Plaintiff cannot point to minor or preliminary issues that may be common to the Class, but instead must identify common questions of law or fact that will actually determine liability.  "That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  As Judge Crabtree explained, this means that "answering each question for one class member answers the question for all class members."  *Bailes v. Lineage Logistics, LLC*, 15-CV-02457-DDC-TJJ, 2016 WL 4415356, at *2 (D. Kan. Aug. 19, 2016).

The primary problem with the questions identified by Plaintiff is that they only focus on half of the issue in this case—how Oxy paid proposed Class members—while failing to address the equally important issue of *what proposed Class members were entitled to be paid*.  The legal duties that Oxy owed to proposed Class members—including the duty to pay on gas used as fuel, the duty to pay on actual proceeds vs. market value, and similar duties—vary depending on the particular language of the contracts between Oxy and the individualized Class members.  The duty to market is the same, but other duties that affect each proposed Class member's entitlement to

damages and the amount of damages, if any, vary.  The question of "did Oxy breach a contract"

cannot be answered classwide where the relevant contract duties differ among Class members.

The District of New Mexico addressed this precise issue and declined to certify a class:

> The underpayment claims, at base, consist of two input inquiries and one output result: (i) "how were the class members entitled to be paid by the Defendants," which is a mixed legal and factual question that requires looking to the language in the leases and any implied-in-law terms; (ii) "how did the Defendants actually pay the class members," which is a factual question that requires looking to the evidence; and (iii) "what is the numerical difference, if any, between (ii) and (i)," which determines damages. Issue (ii) is common, but it is undisputed, and, thus, incidental. It is not merely "capable of" a [sic] producing a common answer, *Wal–Mart,* 131 S.Ct. at 2545, it has already been given one. The Court thus does not believe, after *Wal–Mart,* that the Defendants' uniform payment policy is the common question that satisfies rule 23(a)(2). Issue (i)—how were the class members entitled to be paid by the Defendants—is the important one in this case, and it is an individualized inquiry.

*Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 438–39 (D.N.M. 2015), adhered

to on reconsideration, 312 F.R.D. 620 (D.N.M. 2015) (internal citation omitted); *see also Wallace*

*B. Roderick Revocable Living Tr. v. XTO Energy, Inc*., 725 F.3d 1213, 1218 (10th Cir. 2013)

(declining to find a common question simply because the lessee used a common method of

payment).  Just as in *Anderson* and *Wallace B. Roderick*, the question of how proposed Class

members were entitled to be paid is an individualized issue.  Here, three of Plaintiff's four allegedly

common questions boil down to the issue of what each Class member was entitled to be paid by

Oxy, and that question depends both on the particular lease language and on when the gas from

each well became marketable.  These individualized inquiries destroy commonality because

answering these questions for one Class member cannot answer them for all Class members.

        1.     <u>This Court does not need to decide the Plaintiff's first question on the implied duty to market</u>.

The first question is not a question at all: it is simply the law in Kansas that the types of leases at issue in this case include an implied duty to market. *Fawcett*, 302 Kan. at 351 ("Under Kansas law, the leases imposed on the operator an implied duty to market the minerals produced."). This is a settled question that this Court need not answer again. Plaintiff's argument is essentially that, because all of the Class Leases contain the implied duty to market, the Class must be certified, but identifying a common *fact* among Class members does not equate to a common *question*.

        2.     <u>The second question does not ask a determinative question, and whether Oxy properly deducted fees is not a common question</u>.

The second question, whether Oxy deducted *pre-sale fuel and costs* from royalties, does not address the relevant issue: did Oxy deduct *pre-marketable condition costs* from royalties or, stated another way, was Oxy entitled to deduct the costs in calculating Class members' royalties? That question requires an analysis of when gas from a particular well was in marketable condition *and* of the specific terms of each Class member's lease. Contrary to Plaintiff's argument, *Fawcett* does not hold that the only place at which gas is in marketable condition is at the actual good-faith sale point; an operator is free to choose to sell the gas further downstream from the first marketable point if doing so would lead to a higher price. In *Coulter*, the Kansas Supreme Court explicitly recognized that an operator can choose to sell the gas in a more processed form farther downstream and deduct the cost of enhancing the value of the stream:

> But once the gas is in marketable condition, . . . the lessor (royalty owner) can be charged with . . . a proportionate share of the cost to enhance the value of the gas stream, e.g., the processing costs to extract a saleable component such as helium.

*Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 362 (2013). The question of marketable condition cannot be answered on a classwide basis because the answer depends on when gas from

a particular well reached marketable condition, including but not limited to where the gas was actually marketed from a particular well—it may have been marketable at the point where Oxy sold it to a third party, or it may have been marketable before that sale.  As the Tenth Circuit has held, "if gas is in marketable condition at the mouth of 'Well A' but not 'Well B,' [the lessee's] deductions likely would be proper for Well A's royalty owners, but a breach of the IDM for Well B's royalty owners. In other words, the propriety of [the lessee's] deductions might vary by well, depending on gas quality." *Wallace B. Roderick Revocable Living Tr.*, 725 F.3d at 1219.  Once that question is answered, it is then possible to determine whether Oxy deducted costs properly for a particular well, based on the particular lease terms.  Here, the gas properties vary significantly from well to well.  Exhibit A, McBeath Report, at 25 – 27.  Those differing properties, which affect the gas's suitability for particular uses, include liquids content, heating value, H2S content, and inert gas content.  *Id*. at 26 – 27.  With respect to at least some of these characteristics, such as H2S content, Plaintiff's wells produce gas at the extreme end of the range of values.  *Id*. at 26.  Plaintiff's wells do not represent a good cross-section of the types of gas produced from the Class Wells.  Applying the standard set out in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016), Plaintiff's evidence, in the form of an expert report quantifying damages, cannot be used classwide because it assumes that all gas from all Class Wells was marketable at the same point.  This gives at least some Class members rights they would not have had in an individual action, where they would have had to prove that the specific gas from their Class wells was not marketable until it was processed.

Many (but not all) of the market value and *Waechter* leases in the proposed Class require royalties to be paid on the market value of the gas "at the well."  There is an open question as to whether, in Kansas, "at the well" language means that the royalty owner is only entitled to the

market value of the raw gas as it exists at the wellhead, and therefore the operator can deduct all processing and transportation costs. *See Fawcett*, 302 Kan. at 364–65; *see also Hockett v. Trees Oil Co.*, 292 Kan. 213, 223–24 (2011), as corrected (June 20, 2011) (leaving open the question of whether proceeds at the wellhead are net of post-production costs). This is a key legal issue on the responsibility for deductions for proposed Class members with market value "at the well" language, but it is not an issue for those who have proceeds leases or for certain other proposed Class members whose market value or *Waechter* leases do not contain the "at the well" language.

Finally, the question of fuel is not common to the Class. Lease forms 2-6, 8, 13-16, and 20 only require payment on gas marketed or sold, not on gas used as fuel. *See* Exhibit E. As a matter of law, lessors with proceeds leases are only entitled to the proceeds on gas sold. To the extent a lease requires payment on gas used, that refers to gas actually used by Oxy. *Roco, Inc. v. EOG Res., Inc.*, 14-1065-JAR-TJJ, 2016 WL 6610896, at *19 (D. Kan. Nov. 9, 2016). If some of the gas stream was unsold or unused, lessors under proceeds leases are not entitled to a royalty payment on that unsold or unused gas. *See id.* Whether lessors with market value and *Waechter* leases are entitled to royalty payments only on gas sold, on gas used, or on all gas produced depends on the specific language of the lease. Even where the leases allow for payment on gas used as fuel, some of them—including the 116 Form 1 leases—have a different royalty rate for gas used as fuel. *Id.* Plaintiff's expert has done nothing to account for these differences in lease language. He calculates damages for fuel across the Class, without eliminating those royalty owners who are not entitled to fuel payments, and he calculates a damage amount for fuel based on a percentage of the owner's MCF of gas, without accounting for the different royalty rate applicable to some leases. *See* Reineke Report Ex. 2. Again, applying the standard in *Tyson*, allowing this case to proceed as a class, and relying on Plaintiff's purported classwide evidence,

would give some Class members legal rights contrary to the language of their leases—rights they would not possess in an individual action. *Tyson*, 136 S. Ct. at 1048; *see also In re Asacol Antitrust Litig.*, 907 F.3d 42, 56 (1st Cir. 2018). This is impermissible.

3.   The third question is necessary only with respect to proceeds leases and therefore is not common to the Class.

The third question, whether Oxy paid Plaintiff and proposed Class members based on a price less than what Oxy or its affiliates received in a good-faith transaction, is at best relevant only to proceeds leases, which make up a small part of the proposed Class. (It is also only relevant as to residue gas sold to OEMI; for all Class members, NGLs and helium were sold to unaffiliated third parties, and some unprocessed gas was sold to unaffiliated third parties.) For market value and *Waechter* leases, which represent the slim majority of the leases in the proposed Class, Oxy must pay royalty owners at least the market value of the gas at the wellhead for off-premises sales, regardless of the proceeds Oxy actually receives or the price an Oxy affiliate receives in a sale further downstream. "Under market value leases, royalties are to be computed upon the price that would be paid by a willing buyer to a willing seller in a free market, based upon the arbitrated price." *Smith v. Amoco Prod. Co*., 272 Kan. 58, 76, 31 P.3d 255, 268–69 (2001).

4.   The fourth question again does not address a determinative issue, and whether Class members are entitled to this interest is not a common question.

The fourth question, concerning interest on the Conservation Fee refund, is a minor issue in this case, and standing alone, cannot justify class certification. In addition, the question, as framed, does not address whether any proposed Class member is actually entitled to this interest. The relevant statute, K.S.A. 55-1615[4], does not apply to "excluded payments," which are defined

---

[4] *Roderick v. XTO Energy, Inc*., 08-1330-EFM-GEB, 2016 WL 4039641, at *12 (D. Kan. July 28, 2016) (holding that Section 55-1615 applies to interest on Conservation Fee payments).

as payments to one payee that do not exceed $100 in the aggregate in a 12-month period.  K.S.A. 55-1614(i).  Whether any particular Class member is entitled to interest requires an examination of the total payments made in each relevant year *to that Class member*.  This individualized inquiry determines a Class member's *entitlement* to damages, not the *amount* of damages.  This liability question cannot be answered classwide.  Even if Plaintiff's expert presents a spreadsheet showing each Class member's total payments for each year, it will be necessary to review each year for each Class member and make a year-by-year, Class-member-by-Class-member determination of the answer; a single document consolidating the information will not lead to a single result.  As a result, even the claim relating to interest on the Conservation Fees refunded by Oxy does not support class certification.

### E.      Typicality

Where a court must examine a different legal instrument for each class member, the typicality prong is not met.  In *Swisher v. United States*, 189 F.R.D. 638, 641 (D. Kan. 1999), the court declined to certify a class because it would have had to look at individual deeds and easements conveying property interests to a railroad to determine whether the particular use was within the railroad's rights.  The court found that the plaintiff's claims were not typical of the class because, among other reasons, the court would have had to "resolve this issue based on the language of each easement," and "the Court question[ed] whether plaintiff has any interest in prosecuting cases with different conveyance language."  *Id.* at 642.  Here, the Court will be required to look at each individual lease to determine (1) if the Class member was entitled to payment on the market value of the gas, regardless of the actual sale price; (2) if the Class member was entitled to payment on the gross or net proceeds of an actual sale, and if so, whether that sale was in good faith; (3) if the Class member is entitled to be paid on the fuel used by Oxy or others, and if so, what royalty rate applies.

The Plaintiff's leases are proceeds leases.  Hitch Decl. Exs. 1-2 (Pl.'s Ex. A).  As described above, the question of whether Oxy's actual sales were good-faith sales is likely relevant to determining the proper royalty paid on proceeds leases, but it is not relevant to the question of the proper royalty payments on market value leases, where the leases require payment on the market value *at the wellhead* and the sale was at a later downstream point.  Therefore, one of the key questions identified by Plaintiff does not even apply to Plaintiff's leases.  Likewise, proceeds leases do not raise the "at the well" issue found in some market value and *Waechter* leases, which may determine where and when Oxy could deduct costs.  *See Fawcett* at 364 – 65.  The proceeds leases in this case are also uniform in stating that Oxy only had to pay royalties based on the gas sold, while the market value and *Waechter* leases vary depending on the precise language.  *See* Exhibit E.  Because variations in lease language control, and not all of the allegedly common questions identified by Plaintiff even apply to Plaintiff's leases, Plaintiff's claims are not typical. In addition, gas from at least one of Plaintiff's wells was sold under an Irrigation Contract, and gas from two of Plaintiff's wells was used at the wellhead to fuel the pumping unit.  Exhibit A, McBeath Report, at 12 – 15.  The factual analysis of where gas from Plaintiff's wells was in marketable condition is therefore different from the analysis for those wells where gas was not sold or used at the wellhead.  Exhibit B, Becker Report, at ¶ 42.

## F.  Adequacy

Plaintiff must have the same interests as other proposed Class members to be an adequate class representative.  *See, e.g., Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  Here, Plaintiff's leases are different from over half of the proposed Class members' leases.  Its rights to royalty payments are therefore different, and it does not have the same interests as proposed Class members who have different lease rights.  *See* Exhibit B, Becker Report, at ¶¶ 32 – 42, 46 – 50. The facts of the use and marketing of gas from Plaintiff's wells—including the Irrigation Contracts

and use in fueling the pumping unit—also differ from the facts applicable to other Class members. Plaintiff cannot be expected to pursue the interests of Class members that have no bearing on its own interests.

### G.    Predominance and Superiority

Plaintiff seeks certification under Rule 23(b)(3), which requires proof that common questions predominate over individual questions and that a class action is the superior method of adjudication.

#### 1.    Plaintiff cannot establish predominance.

As explained above, Plaintiff has failed to identify any key questions of fact or law that will be common to all Class members.  While certain preliminary issues may be common to the Class, the outcome-determinative question—whether Oxy is liable to any particular Class member—must be determined on an individual basis because of the differences in lease language and the differences in where the gas from individual wells became marketable.  Each Class member would need to present different evidence that is specific to the wells tied to their lease.  Whether that evidence comes from Oxy's files or the Class member's files, or is the subject of expert testimony, is irrelevant; what matters is that each Class member would have to locate and present different pieces of evidence specific to their leases.  For these same reasons, damages cannot be decided on a classwide basis.

In addition, many proposed Class members' claims may be barred by the statute of limitations.  The statute of limitations is five years.  *See* K.S.A. 60-511.  Plaintiff seeks compensation for royalties from 2007-2014 but did not file this lawsuit until 2018.  The claims for 2007-2013 are barred unless an individual Class member can demonstrate that equitable estoppel applies, which requires an individualized examination of whether that proposed Class member undertook reasonable diligence to discover his or her claims.  *Roderick v. XTO Energy, Inc.*, 08-

1330-EFM-GEB, 2016 WL 4039641, at *14 (D. Kan. July 28, 2016).  This is not an affirmative defense that applies to a handful of anomalous Class members, but rather one that applies to all Class members—and one that the Class members can only defeat with individualized evidence consisting of testimony from each Class member about the elements of equitable estoppel.[5]

Plaintiff's CEO, Jason Hitch, has submitted a declaration that describes his knowledge about the claims he asserts, but he cannot testify about the knowledge or diligence of other Class members.  In particular, resolution of this issue may depend on whether a proposed Class member was a member of the *Littell* settlement class, because members of that class who had notice of the settlement have known about (and accepted) Oxy's deduction of processing costs since at least February 2008 and therefore cannot credibly claim equitable estoppel.  The notice of settlement in that case contained the following provision:

> Nothing contained in the Settlement Agreement is intended to alter or restrict OXY's ongoing practice of charging the accounts of its royalty owners with a pro-rata share of the fees and costs which it incurs to process the gas in a processing plant and to transport it on mainline transmission pipelines under approved FERC tariffs, so long as such royalty owners continue to receive the benefits of such activities in the form of their allocated share of the proceeds of sale received by OXY for the natural gas liquids, helium or other extracted products and the residue gas which is sold after such transportation and processing occur.

*See* Exhibit D, Notice of Proposed Settlement of Class Action.  Exhibit 1 to the Stipulation of Settlement contains similar language:

> OXY now pays (and previously has paid) royalties on NGL's and helium by applying the applicable royalty percentage to one hundred percent (100%) of the proceeds of sale which it receives for liquid hydrocarbons and helium after deducting the cost of processing where applicable and the applicable severance taxes. OXY allocates back to each lease on a mmbtu basis with respect to liquids and on a volumetric basis with respect to helium.

---

[5]     Defenses that require individualized evidence weigh against certification.  *See, e.g., Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1011 (D. Kan. 2018) (Melgren, J.).

*See* Exhibit G, Stipulation of Settlement, at Ex. 1.

Despite relying on the terms of this settlement in the Petition, Plaintiff has refused to confirm for certain in discovery that it was part of the *Littell* class.  *See* Exhibit H, Pl.'s Resp. to Req. for Admission 1-2.  Plaintiff recognizes, though, that the *Littell* settlement of gathering charges controls in this case, indicating that there is an overlap between this proposed Class and the *Littell* class.  *See* Reineke Report at 3 n.2 (Pl.'s Ex. C).

Plaintiff has not suggested any method by which an expert or other class-wide testifier could provide evidence of each Class member's diligence in investigating claims, or what individualized knowledge each Class member had about potential claims.  This issue cannot be resolved through testimony of Plaintiff but requires evidence from each Class member.  This further demonstrates that this case will require individualized inquiries and should not be certified.

2.    Plaintiff cannot establish superiority.

By statute, relevant factors on superiority include:  "(A) The class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  FED. R. CIV. P. 23 (b)(3).  Here, individual Class members may have an interest in controlling separate actions where their lease language differs from Plaintiff's lease language in material respects, or where the gas produced from their wells was marketed differently than Plaintiff's gas; those other Class members will otherwise have to rely on Plaintiff to protect rights that Plaintiff does not share.  Class certification is not necessary to concentrate the actions in a particular forum; because the Class is defined by ownership of real property in a limited geographic area, individual actions would necessarily be concentrated in this forum.  Finally, this case poses a web of complex questions dependent on

individual lease language, when gas from individual wells reached marketable condition, and how and where gas was sold from individual wells, which will make case management difficult. As discussed further in Section V below, concerning Oxy's objections to the submission of class action certification cases as evidence, there is no trend in favor of certifying class actions involving royalty issues.

### V. <u>Objections to Declaration of Rex Sharp</u>

Oxy objects to the Declaration of Rex Sharp, Plaintiff's Exhibit B, to the extent it contains lawyer argument and purports to offer expert opinions on lease interpretation.  Mr. Sharp has not been designated as an expert in this matter, and any opinions he expresses in his Declaration should be considered as argument, not evidence.  In particular, Oxy objects to Paragraph 4 of Mr. Sharp's Declaration.

Oxy objects to Exhibit 2 to the Declaration of Rex Sharp, which is described as a "lease summary spreadsheet" prepared by Mr. Sharp's staff.  Oxy does not object to this Exhibit 2 as a demonstrative aid, but it should not be admitted as evidence because it contains argument prepared by attorneys (or an attorney's staff) about the meaning of the underlying leases, including the meaning of the leases and whether the leases allow deductions.  For the same reasons, Oxy objects to the admission of Exhibit 3 to the Declaration of Rex Sharp, a "lease type key," as evidence in this matter.

Oxy objects to Exhibit 17 to the Declaration of Rex Sharp, which is described in Paragraph 17 of that declaration as "a true and correct compilation of industry quotes on marketable condition from publicly available filings or websites, prepared by my staff at my direction.  Attached to the compilation are true and correct copies of each source document identified on the compilation."  This exhibit is not cited in Plaintiff's Motion, and it is not clear what purpose it is intended to serve, but it is a collection of irrelevant hearsay statements that cannot be relied upon as evidence

in support of Plaintiff's Motion.  FED. R. EVID. 801, 802.  The compilation itself is inadmissible; it does not meet the standard for an admissible compilation, and the quotes included are taken out of context and are hearsay.  FED. R. EVID. 803, 804, 1006.  It is merely the interpretation and arranging of information by Plaintiff's counsel, which is argument, not evidence.

The source documents include SEC filings by other companies, excerpts from depositions in other cases, printouts of websites, and other miscellaneous material, all of which are hearsay. FED R. EVID. 801, 802.  While Mr. Sharp may be able to attest to these being correct copies of these documents, he cannot attest to the truth of any of the matters asserted in these documents, nor does he have business records affidavits or any other similar documentation that would exempt these documents from the prohibition against hearsay.  *Id*.  To the extent these documents are intended to show some sort of industry consensus on marketable condition, that is a matter for expert testimony, not attorney argument.   Judge Robinson has previously excluded similar documents submitted by Mr. Sharp in a proposed royalty class action on the basis of hearsay and irrelevance.  *Roco, Inc. v. EOG Res., Inc*., 14-1065-JAR-TJJ, 2016 WL 6610896, at *7 (D. Kan. Nov. 9, 2016) (Robinson, J.).

Oxy also objects to Exhibits 18, 20-21, and 25 to the Sharp Declaration, which consist of copies of orders in other cases.  To the extent these are merely provided as courtesy copies of legal authority to the Court, Oxy does not object, but to the extent they are intended to be admitted or considered as evidence, Oxy objects.  As Judge Robinson noted in *Roco*  regarding a similar submission by Mr. Sharp of legal opinions in other cases as evidence, "it is wholly inappropriate for the Court to consider the ruling of another court as evidence in this case between different parties."  *Id.* at *6.

In addition, Oxy objects to Exhibit 18 to the Sharp Declaration in that it provides an outdated and incomplete selection of precedent on class action certification and because it includes primarily Kansas state court cases, not federal court cases. The case listing in Exhibit 18 ceases in 2012, the point at which the tide turned against royalty class action certification in Kansas state court, and across the country. *Wal-Mart*, *Coulter*, and *Roderick* all raise the bar for, and disfavor, certification for royalty class actions.

Other recent district court decisions demonstrate the balance of current certification trends. In *Arkalon Grazing Association v. Chesapeake Operating, Inc.*, 09-1394-CM, 2014 WL 3089556, at *4 (D. Kan. July 7, 2014), Judge Murguia decertified a royalty owner class, noting the benefit of recent Supreme Court and Tenth Circuit precedent. The facts are similar to those at hand, in that the leases had some variation; but, even more importantly, the individualized inquiry into marketability at the wellhead dominated over any common questions. *Id.* at 3. Likewise, in *Gagnon v. Merit Energy Co.*, 14-CV-832, 2015 WL 9489609, at *6 (D. Colo. Dec. 30, 2015), the court refused to grant class certification because, *even if* the implied covenant to market applied across all leases, "[i]ndividualized analysis of the wells is necessary to determine the point of marketability of gas from each *well*." These are just two of a litany of examples following *Wal-Mart* in 2011 in which courts refused to certify, or decertified, classes of royalty holders. *Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 F. App'x. 938 (10th Cir. 2013); *Morrison v. Anadarko Petroleum, Corp.*, 280 F.R.D. 621 (W.D. Okla. 2012); *Foster v. Merit Energy Co.*, 282 F.R.D. 541 (W.D. Okla. 2012); *Foster v. Apache Corp.*, 285 F.R.D. 632, 647 (W.D. Okla. 2012); *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 344 (D.N.M. 2015). The trend, contrary to Plaintiff's insinuation in Exhibit 18, is for courts to deny class certification in royalty cases.

Finally, Oxy objects to Exhibit 24 to the Sharp Declaration, a trial transcript from another case, as hearsay.  FED R. EVID. 801, 802.  Oxy requests that the Court exclude Exhibits 2, 3, 17, 18, 20-21, and 24-25 to the Sharp Declaration.

## VI. <u>Motion to Exclude Testimony of Daniel Reineke</u>

Plaintiff has submitted the report of Daniel Reineke in support of its Motion (Plaintiff's Exhibit C).  Mr. Reineke's report concerns damages, not any of the allegedly common questions of law and fact identified in Plaintiff's Motion.  His report primarily describes the factual situation of Oxy's payment process rather than providing any expert opinions.  However, on the one damages issue on which Mr. Reineke offers an opinion rather than recitation of facts, he relies on an incorrect premise, and his opinion must therefore be excluded.  FED R. EVID. 702 (requiring that "the testimony is the product of reliable principles and methods" to be admissible).  Mr. Reineke also fails to take into consideration individual lease language, particularly with respect to his opinion on whether royalty owners should have been paid for fuel used.

Oxy sells residue gas to its affiliate, OEMI, at the interstate pipeline Index Price.  As Mr. Reineke notes, Oxy pays royalty based on the Index Price that it receives.  Reineke Report at 4.  OEMI then sells the residue gas to third parties.  *Id.*  Because the price OEMI receives from third parties is sometimes higher than the Index Price Oxy receives from OEMI, Mr. Reineke opines that Oxy should have paid royalty owners on whichever price was higher:  the Index Price Oxy actually received or the third-party price OEMI received.  *Id.* at 4-5.  Mr. Reineke states that he "understand[s] Kansas law entitles royalty owners to be paid royalty on the best available price," and this assumption provides the basis for his opinion.  *Id.* at 4.  This assumption is incorrect and ignores lease language and case law, in addition to being contrary to Mr. Reineke's prior opinions in other cases.

The law in Kansas regarding an operator's duty on pricing is "to act at all times as a reasonably prudent operator."  *Smith v. Amoco Prod. Co*., 272 Kan. 58, 82, 31 P.3d 255, 272 (2001).  There is no duty to obtain the best price possible at any possible sale location, nor is there an obligation to pay the royalty owner on the "best available price" at any sale location and under any circumstances, regardless of the location and circumstances of the actual sale.  *Id*.  Here, the Index Price (on which royalties were paid) and the weighted average sales price received by OEMI in its third-party sales were very similar, and in many months, the Index Price was higher than the WASP price.  *See* Ex. 11 to the Sharp Decl. (filed under seal).  Mr. Reineke does not explain how Oxy, as a reasonably prudent operator, could have arranged a situation in which Oxy itself would have been able to obtain from its purchaser the higher of the WASP (which is determined after the fact and includes spot sales) or the Index Price.  Yet Mr. Reineke opines that Oxy must pay royalties to the proposed Class members on this unrealistic and unobtainable price.  Mr. Reineke's opinions, based on this nonsensical premise, must be excluded.

Further, as Plaintiff explains throughout its Motion, the operator's obligation is to put the gas in marketable condition and to market it; absent specific lease language, the operator is not required to sell the gas at some *downstream* point at which it might fetch a higher price.  Mr. Reineke appears to contend here that the gas was not in marketable condition when Oxy sold it to OEMI at the interstate pipeline Index Price, but that Oxy had a duty to sell the gas further downstream for a higher price, if a higher price could be obtained.  But Mr. Reineke has previously opined, including in the *Roco* case, that residue gas is in marketable condition "at the Index pool for residue gas."  *Roco, Inc. v. EOG Res., Inc*., 14-1065-JAR-TJJ, 2016 WL 6610896, at *11 (D. Kan. Nov. 9, 2016).  The *Roco* court excluded Mr. Reineke's report and opinions because, based on *Fawcett*, it found that gas could be in marketable condition well before the index pool.  *Id*.  Mr.

Reineke now seeks to go beyond this previously excluded opinion and push for a market point *downstream* of the index pool, a viewpoint inconsistent with his previous opinion and entirely inconsistent with *Fawcett*.

In addition to these issues with Mr. Reineke's underlying premises, Mr. Reineke has calculated damages without regard for differences among the Class Leases and Class Wells.  For example, Mr. Reineke has not accounted for the fact that different Class Leases require payment on different volumes of gas.  *See* Exhibit E.  He has also made significant factual errors, including failing to address gas sold under third-party Irrigation Contracts; adding royalties for gas sold to third parties at the well, even though Plaintiff does not complain about those sales; adding royalties on fuel flared or used by the processing plant and gathering system for which Oxy already paid Class members; and adding damages attributable to working interest owners (who are not Class Members) from 2007-2009.  *See* Exhibit B, Becker Report at ¶¶ 67 – 73.

Mr. Reineke's opinion on damages is unreliable because it is based on an incorrect understanding of case law, fails to address differences in lease language and facts among Class members and Class Wells, misstates facts, and directly conflicts with his prior opinions.  He also offers an improper legal conclusion on royalty owners' alleged right to be paid "on the best available price."   Reineke Report at 4.  Oxy respectfully requests that the Court exclude his opinions and report on class certification issues.

## VII. <u>CONCLUSION</u>

For the foregoing reasons, Oxy respectfully requests that the Court (1) deny Plaintiff's Motion for Class Certification, (2) exclude or decline to consider as evidence Exhibits 2 – 3, 17, 18, 20 – 21, and 24 – 25 to the Declaration of Rex Sharp, and (3) exclude the opinions and report of Daniel Reineke.

Dated: November 16, 2018

                         Respectfully Submitted,

                         FOULSTON SIEFKIN LLP


                         *s/ James M. Armstrong*
                         James M. Armstrong, KS No. 09271
                         Mikel L. Stout, KS NO. 05811
                         1551 N. Waterfront Parkway, Suite 100
                         Wichita, KS 67206-4466
                         Phone: (316) 291-9576
                         Fax:  (316) 267-6345
                         jarmstrong@foulston.com
                         mstout@foulston.com

                         **Attorneys for OXY USA, Inc.**

**OF COUNSEL**

Mark C. Rodriguez, TX Bar No. 00794554 (admitted *pro hac vice*)
Deborah C. Milner, TX Bar No. 24065761 (admitted *pro hac vice*)
Aurra M. Fellows, TX Bar No. 24101742 (admitted *pro hac vice*)
VINSON & ELKINS LLP
1001 Fannin Street, Suite 2500
Houston, TX 77002
Tel:   (713) 758-3288
Fax:  (713) 615-5314
Email:  mrodriguez@velaw.com
Email:  cmilner@velaw.com
Email:  afellows@velaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 16th day of November, 2018, I presented the foregoing to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing ("NEF") to the following ECF registrants:

| | |
|---|---|
| Rex A. Sharp | rsharp@midwest-law.com |
| Barbara C. Frankland | bfrankland@midwest-law.com |
| Ryan C. Hudson | rhudson@midwest-law.com |
| Scott B. Goodger | sgoodger@midwest-law.com |

Rex A. Sharp, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
*Attorneys for Plaintiffs*

*s/ James M. Armstrong*
James M. Armstrong