# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

HITCH ENTERPRISES, INC.

      *Plaintiff,*

  vs.

OXY USA INC.,

      *Defendant.*

Case No. 18-1030-EFM-KGG

## MEMORANDUM AND ORDER

This matter comes before the Court on three motions: Plaintiff Hitch Enterprises, Inc.'s ("Hitch") Motion to Certify Class (Doc. 33), Defendant Oxy USA Inc.'s ("Oxy") Motion for Partial Summary Judgment (Doc. 66), and Hitch's Motion to Strike Expert Reports of John C. McBeath and Stephen L. Becker and Exclude Their Testimony (Doc. 57). For the following reasons, the Court denies Hitch's Motion to Certify the Class, grants in part and denies in part Oxy's Motion for Partial Summary Judgment, and denies Hitch's Motion to Strike.

## I.　　　Factual and Procedural Background

Hitch and the putative class are royalty owners in approximately 631 oil and gas wells located throughout Kansas. Oxy operates these wells and produces, among other things, Residue Gas, NGLs, and Helium. All the gas from these wells was comingled on the same gas lines and processed at the same location (the Jayhawk Processing Plant) under a single Processing

Agreement.  After processing, Oxy sold most of the Residue Gas and about half the NGLs to its affiliate, Occidental Energy Marketing, Inc. ("OEMI"), and OEMI subsequently sold those products further downstream to unaffiliated third parties.  Oxy sold the Helium to ONEOK Field Service Company.

As general background, oil and gas operators frequently perform Midstream Services—Gathering, Compression, Dehydration, Treatment, and Processing ("GCDTP")—to prepare raw gas for market.  Here, most of the gas from the putative class wells was Gathered, Compressed then delivered for Processing at the Jayhawk Processing Plant.  A small percentage of the gas underwent no GCDTP services and was sold as irrigation gas or was used as house gas.  The central issue in this case relates to Processing costs Oxy deducted from its royalty checks to the putative class.

Hitch initiated this lawsuit on January 11, 2018, in the District Court of Seward County, Kansas, alleging that Oxy breached its lease with the putative class members by underpaying royalties from July 1, 2007, to April 30, 2014.  Hitch was a member of a previous class action in Kansas state court—*Littell v. Oxy*[1]—that settled claims against Oxy for improper deductions taken for Gathering, Compression, Dehydration, and Treatment Costs prior to July 1, 2007.  As a member of *Littell*, Hitch received a Notice of Proposed Settlement, stating:

> Nothing contained in the Settlement Agreement is intended to alter or restrict OXY's ongoing practice of charging the accounts of its royalty owners with a pro-rata share of the fees and costs which it incurs to process the gas in a processing plant and to transport it on mainline transmission pipelines under approved FERC tariffs, so long as such royalty owners continue to receive the benefits of such activities in the form of their allocated share of the proceeds of sale received by OXY for the natural gas liquids, helium or other extracted products and the residue gas which is sold after such transportation and processing occur.

---

[1] *Littell v. OXY*, Case No.  98-CV-51 (Kan. Dist. Ct. Stevens Cnty.).

In the lawsuit now before the Court, Hitch alleges two ways in which Oxy underpaid royalties. First, Oxy deducted from royalties a portion of the costs Oxy expended processing the gas. These deductions were taken in cash and in kind.[2] Hitch asserts that these deductions were impermissible because it was Oxy's sole obligation to pay all pre-sale costs necessary to make the gas marketable, including Processing costs. Second, when OEMI purchased the Residue Gas and NGLs from Oxy, OEMI paid Oxy based on a standardized Index Price. OEMI later resold those products downstream to third parties and sometimes—though not always—the weighted average sales price ("WASP") of OEMI's third-party sales was higher than the Index Price. Oxy always calculated its royalty payments based on the Index Price. Hitch asserts, however, that it was entitled to be paid royalties on whichever was higher each month: the Index Price or OEMI's WASP.

Hitch also brings a separate claim seeking interest on Conservation Fees that Oxy previously deducted from its royalty payments and later refunded. The Kansas Corporation Commission imposes Conservation Fees under K.S.A. § 55-166. Whether these Conservation Fees were the sole responsibility of oil and gas operators was an open question in Kansas until 2011, when the Kansas Supreme Court held in *Hockett v. Trees Oil Company*[3] that these fees are an expense attributable to the well operator alone.[4] In light of *Hockett*, Oxy refunded the wrongly

---

[2] For the Residue Gas, Hitch alleges that Oxy took Processing deductions for fees, retainage, plant fuel, recompression, treatment, etc. For the NGLs, Hitch alleges that Oxy took deductions from royalties "by the amount of the NGLs processing deductions (such as retainage percentage and TF&S)" and "by not receiving payment based on the full NGL recover[y] factors for each NGL." For the Helium, Hitch alleges that Oxy "[took deductions] (directly or indirectly, and in case, in kind, or both) from royalties by way of Helium processing deductions."

[3] 292 Kan. 213 251 P.3d 65 (2011).

[4] *Id.* at 72.

withheld Conservation Fees to Hitch and the putative class. However, Oxy paid no interest on the refunded Conservation Fees, and Hitch argues that it was owed interest at 10% per annum.

On February 2, 2018, Oxy removed this case to federal court. Hitch filed a motion with this Court to certify the following class:

> All royalty owners in Kansas wells: (a) where Oxy USA Inc. was the operator (or, as a non-operator, separately marketed gas); (b) who were paid royalties for production of gas, NGLs, or Helium from July 1, 2007 to April 30, 2014; and (c) whose gas was moved over the ONEOK/West Texas Gas/NNG lines to the Jayhawk Plant for processing.

> Excluded from the Class are: (1) the Office of Natural Resources Revenue, formerly known as the Mineral Management Service (Indian tribes and the United States); (2) all presiding judge(s) together with their immediate family members; (3) Oxy USA Inc. its affiliates, its predecessors-in-interest, and their respective employees, officers, and directors; and (4) royalty owners who receive royalty under the leases expressly allowing the deduction of processing expenses.

Hitch's Motion for Class Certification included a sworn declaration by Hitch's counsel, Rex Sharp, and an Expert Report by Daniel Reineke.

Oxy opposes class certification. Within Oxy's Response to Hitch's Motion, Oxy objected to the Sharp Declaration and the Reineke Report, asking the Court to strike both. Additionally, Oxy provided two expert reports prepared by John McBeath and Stephen Becker. Hitch objects to the McBeath and Becker reports and filed a separate motion to strike both.

On March 11, 2019, Oxy filed a Motion for Partial Summary Judgment, seeking judgment on three claims. First, Oxy argues that the statute of limitations bars all of Hitch's claims occurring before January 11, 2013. Second, Oxy argues that Kansas law does not require Oxy to pay 10% interest on the refunded Conversation Fees. Third, Oxy argues that it paid royalties on all "field fuel" and "plant fuel." On June 5, 2019, the Court, at the parties' request, held a hearing on these motions. The Court now rules as follows.

## II.    Legal Standard

### A.    Class Certification

Class action certification is governed by Rule 23 of the Federal Rules of Civil Procedure. The Court has broad discretion in deciding whether to certify a class.[5]  Under Rule 23(a), Hitch must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there is a question of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).  After meeting these requirements, Hitch must demonstrate that the proposed class action fits within one of the categories in Rule 23(b).

Here, Hitch seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance) and that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority).  The requirements of Rule 23(b)(3) ensure that a class is sufficiently cohesive to warrant adjudication by representation.[6]  The predominance question asks whether common issues are more prevalent or important than non-common, individual issues.[7]  "[P]redominance may be destroyed if individualized issues will overwhelm those questions common to the class."[8]

---

[5] *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1085 (10th Cir. 2014).

[6] *Amchem Prods. v. Windsor*, 521 U.S. 591, 622–23 (1997).

[7] *CGC Holding*, 773 F.3d at 1087.

[8] *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1220 (10th Cir. 2013).

## B.    Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[9]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[10]  The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[11]  The nonmovant must then bring forth specific facts showing a genuine issue for trial.[12]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[13]  The court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[14]

## III.    Analysis

### A.    Class Certification

Before certifying a class, the Court must undergo a "rigorous analysis" to ensure that each of Rule 23's prerequisites is satisfied.[15]  Class action litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only" and therefore

---

[9]  Fed. R. Civ. P. 56(c).

[10]  *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[11]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[12]  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[13]  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[14]  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[15]  *CGC Holding*, 773 F.3d at 1086 (citations omitted).

"the requirements of Rule 23 are heavily scrutinized and strictly enforced."[16]  Here, Oxy disputes

that Hitch can satisfy any of Rule 23(a)'s requirements except for numerosity.  Oxy also disputes

that Hitch can satisfy Rule 23(b)'s predominance and superiority requirements.  If Oxy is correct

on any of these points, Hitch's proposed class may not be certified.

    1.    *Marketable Condition Rule*

Much of the parties' arguments on the Rule 23 factors (commonality in particular) hinge

on the Kansas Supreme Court's 2015 decision in *Fawcett v. Oil Producers, Inc. of Kansas*.[17]

Specifically, the parties reach differing conclusions about how *Fawcett* changed Kansas'

Marketable Condition Rule,[18] the basis for Hitch's breach of lease claim.  Under the Marketable

Condition Rule, oil and gas operators are obligated to bear all costs necessary to put the product

in "marketable" condition.[19]  Once gas is marketable, an operator may pass onto the royalty owner

a proportionate share of any costs to enhance the value of the gas.[20]

Here, it is undisputed that Oxy deducted from its royalty payments a portion of its

Processing costs.  Where the parties disagree is whether the Processing costs were incurred before

or after the gas was "marketable."  Herein lies *Fawcett*'s significance to this case.  Hitch asserts

that *Fawcett* introduced a new rule, whereby marketability is no longer controlled by the physical

quality of the gas, but rather is determined solely by the presence of a good faith sale.  Simply put:

---

[16] *CGC Holding*, 773 F.3d at 1086 (citations and quotations omitted).

[17] 302 Kan. 350, 352 P.3d 1032 (2015).

[18] The parties and courts have referred to this duty as both the Marketable Condition Rule and the Implied Duty of Marketability ("IDM").  For clarity, the Court will use the term "Marketable Condition Rule" when referring to Oxy's duty to make the gas marketable at its own expense.

[19] *Coulter v. Anadarko Petroleum Corp.*, 296 Kan. 336, 292 P.3d 289, 306 (2013).

[20] *Id.*

Hitch argues that under *Fawcett* gas is market*able* only when it has been market*ed*. If Hitch's interpretation of *Fawcett* is correct, applying the Rule 23 factors in this case is relatively straightforward. It is undisputed that Oxy sold the Residue Gas, NGLs, and Helium after the gas was processed at the Jayhawk Plant. If the gas was not marketable until that sale, Oxy's deductions for Processing costs would have been in violation of its duties under the Marketable Condition Rule. And of great importance to the Rule 23 factors, under Hitch's interpretation of *Fawcett* Oxy's liability would be a common question with a common answer for the entire class. Given the importance of this decision on the issue of class certification, the Court begins its analysis with *Fawcett*.[21]

In *Fawcett*, the Kansas Supreme Court reviewed a district court's order granting summary judgment on behalf of the plaintiffs. The *Fawcett* plaintiffs were royalty owners of 25 oil and gas leases; the defendant oil company operated the wells associated with these leases. The oil company extracted raw natural gas from the wells and sold it at the wellhead to third-party purchasers, who then processed the gas and placed it in the interstate pipeline system. The third-party purchasers paid the oil company "based on a formula that starts with the price those third parties receive[d] for the processed gas (or a published index price) *[minus] certain costs incurred or adjustments made [for GCDTP services]*."[22] The oil company paid royalties based on the price it received from the third-party purchasers and that price included the deductions taken for GCDTP services;

---

[21] Hitch has suggested that it would be improper for the Court to make any ruling on *Fawcett* because it would be addressing the merits of the case. While it is true that it would be improper for the Court "to engage in free-ranging merits inquiries at the certification stage;" the Court may consider the merits to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

[22] *Fawcett*, 352 P.3d at 1034.

thus, the plaintiffs ultimately paid a portion of the GCDTP expenses. The plaintiffs sought summary judgment against the oil company, reasoning that the GCDTP services were necessary to make the gas marketable and should therefore have been paid entirely by the oil company. The district court agreed with the plaintiffs and granted partial summary judgment for those GCDTP deductions. The Kansas Court of Appeals affirmed the district judge's order, concluding that gas is not marketable until the gas reaches mainline transmission pipeline quality.

The Kansas Supreme Court reversed the Court of Appeals and rejected the argument that gas marketability is synonymous with interstate pipeline quality.[23] Instead, *Fawcett* held:

> [W]hen a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point to post-sale expenses. *In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction.*[24]

In short: *Fawcett* held that once gas has been market*ed* (in good faith), the gas is market*able*.

This case presents a different question than *Fawcett*. The issue in *Fawcett* was whether an oil and case operator's duty to put gas into marketable condition continues *after* the gas is sold. The Kansas Supreme Court held that it does not. The issue here, however, is whether it is possible for gas to be in marketable condition, thus relieving the operator of further responsibility under the Marketable Condition Rule, *before* selling the gas. It is Hitch's position that *Fawcett* precludes that possibility. According to Hitch, *Fawcett* created the following bright-line rule: before a good faith transaction, a producer cannot deduct GCDTP expenses; after a good faith transaction, it can.

---

[23] *Id.* at 1039 ("We disagree with [the plaintiff's] equating 'marketable condition' with interstate pipeline quality.").

[24] *Id.*

Hitch's interpretation of *Fawcett*—under which the duty to put gas into marketable condition can be satisfied only by actually marketing the gas—would represent a significant shift in Kansas law. Upon careful consideration of *Fawcett*'s holding and supporting rationale, the Court concludes that Hitch's interpretation of *Fawcett* is incorrect.

This Court's conclusion that under Kansas law gas may be marketable before it is marketed is supported by *Sternberger v. Marathon Oil Company*,[25] which *Fawcett* cited favorably. In *Sternberger*, the gas in question was "marketable at the well" but no market existed at the wellhead.[26] The only way the gas could be marketed was for the defendant oil company to build its own pipeline to transport the gas to an off-site market.[27] The *Sternberger* Court stated that under Kansas law, "[o]nce a marketable product is obtained, reasonable costs incurred to transport *or enhance the value of the marketable gas* may be charged against nonworking interest owners."[28] Thus, *Sternberger* represents two important points of law: (1) gas may be marketable before it is ever marketed—it may even be marketable at the wellhead—and (2) costs expended to *enhance* the value of gas that is already marketable may be shared with royalty owners.

The Tenth Circuit relied on *Sternberger* in reasoning that gas may be marketable at the wellhead of some wells but not others:

> Once gas is in marketable condition, the IDM is satisfied—regardless of whether a market exists at that location. And the Kansas Supreme Court has recognized that gas may be marketable at the well. Thus, if gas is in marketable condition at the mouth of "Well A" but not "Well B," [the defendant's] deductions likely would be proper for Well A's royalty owners, but a breach of the IDM for Well B's royalty

---

[25] 257 Kan. 315, 894 P.2d 788 (1995)

[26] *Id.* at 792.

[27] *Id.*

[28] *Id.* at 800 (emphasis added).

owners. *In other words, the propriety of [the defendant's] deductions might vary by well, depending on gas quality.*[29]

The Court recognizes that the Tenth Circuit's *Roderick* opinion predates *Fawcett*, but the Court discerns nothing from *Fawcett* that would negate *Sternberger* or *Roderick* on this matter. The Court therefore concludes that in Kansas gas may be in marketable condition before it is marketed in a good faith transaction. Having rejected Hitch's interpretation of *Fawcett*, the Court will now analyze the Rule 23 class certification factors to determine whether the class may still be certified.

### 2. *Rule 23*

Oxy argues that Hitch failed to show it can meet nearly all Rule 23(a) and (b)(3)'s requirements. From the Court's perspective, the biggest obstacles to certifying the class are commonality and predominance. So, the Court will begin its analysis there. Under Rule 23(a)(2), Hitch must demonstrate that there are questions of fact or law common to the putative class. In *Wal-Mart Stores, Inc. v. Dukes*,[30] the Supreme Court explained that Rule 23(a)(2)'s "language is easy to misread, since any competently crafted class complaint literally raises common 'questions.' "[31] To prove commonality the plaintiff must "demonstrate that the class members have suffered the same injury."[32] Furthermore, a common question "must be of such a nature that

---

[29] *Roderick*, 725 F.3d at 1219 (emphasis added) (internal citations omitted).

[30] 564 U.S. 338 (2011)

[31] *Id.* at 349–50 (citations, alterations, and quotations omitted) ("For example: Do all of us plaintiffs indeed work for Wal–Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification.").

[32] *Id.* (citation and quotations omitted).

it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[33]

Here, Hitch provides four nonexclusive questions of fact or law common to Hitch and the Putative Class: (1) "Whether [Hitch] and the [Putative] Class are the beneficiaries of an implied duty to market;" (2) "Whether pre-sale fuel and processing costs (in cash or in kind) were deducted from royalties;" (3) "Whether OXY (including any of its affiliates) paid royalty to [Hitch] and the [Putative] Class based on a starting price below what OXY or its affiliates received in arm's-length sales transactions;" and (4) "Whether OXY failed to fully reimburse the royalty owners for wrongfully withheld Conservation Fees by omitting 10% interest under K.S.A. [§] 60-201."

Oxy argues that none of Hitch's proposed questions of fact or law are meaningful because "they only focus on half of the issue in this case—how Oxy paid proposed Class members—while failing to address the equally important issue of *what proposed Class members were entitled to be paid*." The Court now considers each of Hitch's proposed common questions in turn.

a.    Implied duty to market

Oxy argues that Hitch's first proposed common question—whether the leases contain the implied duty to market—is not a question at all. Rather, "it is simply the law in Kansas that the types of leases at issue in this case include an implied duty to market." Oxy argues that "identifying a common *fact* among Class members does not equate to a common *question*." The Court agrees with Oxy that answering Hitch's first proposed common question will not move this case closer to resolution in any meaningful way. The pertinent question is not whether Oxy had an implied duty to create a marketable product; the question is whether Oxy violated that duty.

---

[33] *Id.* at 350.

Under Hitch's interpretation of *Fawcett*, Oxy's liability would be capable of classwide resolution. Hitch would need to prove only that Oxy sold virtually all the gas after it was processed at the Jayhawk Plant. If the gas is not marketable until it is sold, then Oxy clearly could not deduct any of its processing costs from its royalty payments. More importantly, there would be no need to analyze the gas quality on a well-by-well basis because all the gas from the putative class's wells was sold *after* the disputed Processing costs were incurred. As discussed above, the Court disagrees with Hitch's interpretation of *Fawcett*. So, the next question is whether commonality can be met even though the Court holds that gas may be marketable *before* a good faith sale.

At the June 5 hearing, Hitch argued that even if the Court disagreed with its interpretation of *Fawcett*, commonality would still be satisfied because Hitch's expert witness would testify that all the gas was not in marketable condition until after Processing. Oxy, conversely, takes the position that some of the putative class gas was marketable at the well and some of the gas was not; therefore, marketability can only be determined on an individual well-by-well basis.

Hitch directs the Court's attention to the Tenth Circuit's recent decision in *Naylor Farms, Inc. v. Chaparral Energy, LLC*.[34] In *Naylor Farms*, the Tenth Circuit, applying Oklahoma law, upheld a district court's decision to certify a class seeking damages for underpaid royalties. Hitch argues that Oklahoma has adopted the "physical quality" test to determine gas marketability that Oxy argues (and the Court agrees) is the standard in Kansas. Hitch argues that if the Court agrees with Oxy's interpretation of *Fawcett*, the Court should follow the reasoning in *Naylor Farms*.

In *Naylor Farms*, the defendant operated approximately 2,500 oil and gas wells in Oklahoma. According to the plaintiffs' allegations, the defendant attempted to circumvent the

---

[34] 923 F.3d 779 (2019).

Marketable Condition Rule[35] by transferring title of the gas at the wellhead to a Midstream Services provider who performed GCDTP services, but the Midstream Services provider did not actually pay the defendant until it sold the treated gas to downstream purchasers. According to the plaintiff, the royalty owners were eventually paid royalties based on net proceeds that deducted GCDTP costs, so the royalty owners had "to bear the costs of transforming unprocessed gas into a marketable product."[36] The plaintiff moved to certify a class of similarly-situated royalty owners.

The defendant in *Naylor Farms* raised arguments similar to those Oxy raises here, specifically: does each well within the proposed class need to be analyzed individually to determine gas marketability? In answering this question, the Tenth Circuit recognized that the Oklahoma Supreme Court had not provided much guidance on this question; thus, the Tenth Circuit was tasked with predicting how the Oklahoma Supreme Court would rule. The Tenth Circuit also recognized some inconsistency in how the Oklahoma Court of Appeals had applied the Marketable Condition Rule, with one court deciding marketability based on whether the gas was suitable for "the market in which" the operator chose to participate.[37] A rule Kansas does not appear to have adopted.

The Tenth Circuit applied *Pummill*'s "the market in which the operator chose to participate" test in holding that the plaintiff could satisfy commonality. The plaintiff had classwide evidence that the defendant chose to participate in the high-pressure-pipeline market and that *at*

---

[35] In Oklahoma this is referred to as the Implied Duty of Marketability.

[36] *Id.* at 783–84.

[37] *Id* at 787 (analyzing *Pummill v. Hancock Expl. LLC*, 419 P.3d 1268, 1278 (Okla. Civ. App. 2018)).

*least one* GCDTP service was required to prepare the gas for the high-pressure-pipeline market.[38] As such, the Tenth Circuit predicted that the Oklahoma Supreme Court would hold:

> [U]nder the facts of this case, a jury could determine when the gas at issue became marketable without individually assessing the quality of that gas; instead a jury could make this determination based solely on expert testimony that all the gas at issue was required to undergo at least one GCDTP service before it could "reach" and be "sold into" the pipeline market.

The Court concludes that *Naylor Farms* has limited applicability to this case because Kansas has not adopted Oklahoma's test that marketability should be judged based on the actual market the well operator chooses to participate in. In *Naylor Farms*, classwide proof could be presented that gas was not marketable for the high-pressure-pipeline market without at least one GCDTP service. Oxy, however, asserts that marketability can be judged only on an individualized well-by-well basis because, under Kansas law, gas may be marketable at the wellhead without any Midstream Services.

To support this contention, Oxy relies on *Coulter v. Anadarko Petroleum Corporation*,[39] where the Kansas Supreme Court in dicta indicated that gas may be marketable for household use or in irrigation systems before it is suitable for the interstate transmission pipeline.[40] Here, some of the wells in the proposed class provided gas for household purposes and sold some of the gas under irrigation contracts. Based on *Coulter*'s dicta, Oxy argues that some of the gas from the putative class's wells would be marketable at the wellhead (before Processing) as either house gas or irrigation gas.

---

[38] *Id.* at 794–95.

[39] 296 Kan. 336, 292 P.3d 289 (2013).

[40] *Id.* at 307.

Hitch argues that house gas and irrigation gas are irrelevant to this case for two reasons. First, Hitch highlights that only a small percentage of the gas from the putative class wells was used as house gas or irrigation gas—so, even if a small percentage of the gas was marketable at the wellhead for those purposes, the vast majority of the gas was not. Second, Hitch argues that the class definition excludes any gas that was sold as house gas or irrigation gas; because Hitch is not attempting to recover any expenses associated with house gas or irrigation gas, Hitch argues that house gas and irrigation gas should have no bearing on this case. The Court is unpersuaded by either of these arguments.

Hitch's first argument fails to persuade the Court because *Sternberger* states that gas may be marketable even when no market exists for the gas.[41] So, the fact that a small percentage of the gas was sold as irrigation gas or used as house gas does not undermine the possibility that the gas may still have been marketable for those purposes. Furthermore, if some of the gas from the putative class's wells was marketable before Processing—even a small percentage of that gas— Oxy would not be liable to the royalty owners of those wells. Commonality is not satisfied if resolving an issue classwide would give some class members rights to which they are not entitled.

Hitch's second argument fails to persuade the Court because it misunderstands the significance of the house and irrigation gas. Even though Hitch is not seeking to recover any costs associated with the house or irrigation gas, Hitch is arguing that none of the gas from the putative class's wells was marketable before processing. Yet some of the gas from the putative class's wells was used as house gas or irrigation gas without processing at the Jayhawk Plant. *Coulter* informs this Court that using gas for these purposes may be evidence that the gas is marketable as

---

[41] *Sternberger*, 894 P.2d at 792, 800.

household or irrigation gas.[42]  *Sternberger* also informs this Court that gas may undergo further treatment to *enhance* the value of gas that is already marketable.  Thus, it is possible that at least some of the gas within Hitch's proposed class would have been marketable at the wellhead before processing at the Jayhawk Plant, and that the additional processing merely enhanced the value of already marketable gas.  To determine which gas would be marketable as house gas or irrigation gas would require evidence of gas quality at each well.  If some of the gas is marketable at the wellhead and some of the gas is not, whether Oxy breached its duty to make the gas marketable at its own cost cannot be resolved without evaluating individualized, rather than common, evidence.

        b.        Oxy deducting pre-sale costs

Oxy argues that Hitch's second proposed common question—whether Oxy deducted pre-sale fuel and costs from royalties—is not a determinative question.  This issue also hinges on the Court's interpretation of *Fawcett*.  Under Hitch's interpretation of *Fawcett*, gas is not marketable until it is sold in a good faith sale.  If Hitch's interpretation were correct, whether Oxy deducted pre-sale fuel and costs from its royalty payments would be a relevant question.  However, because the Court ultimately disagrees with Hitch's interpretation of *Fawcett,* Hitch's second common question is irrelevant.  Even if Oxy deducted *pre-sale* costs, Oxy is in breach of its implied duties only if it deducted *pre-marketable* costs.  Proving that Oxy deducted pre-sale costs does not prove that Oxy breached its duty to the putative class members.  Thus, answering Hitch's second proposed common question does nothing to bring this case closer to resolution.

---

[42] *Id.*

c.     Paying royalties on Oxy/OMEI sale or OEMI/third party sale

Oxy argues that Hitch's third proposed common question—whether Oxy paid royalties on a starting price below what Oxy or its affiliate, OEMI, received in an arm's-length transaction—is only relevant with respect to proceeds leases and therefore is not common to the entire proposed class.[43]  The Court agrees.  The putative class's leases include market value, proceeds, and *Waechter* leases.  "Under market value leases, royalties are to be computed upon the price that would be paid by a willing buyer to a willing seller in a free market, based upon the arbitrated price."[44]  Thus, the putative class members with market value leases have no interest in whether OEMI received a higher WASP than the Index Price in its subsequent sales; those royalty owners were not paid on the actual proceeds from the sale.  Setting aside the disputed issue of whether class members with proceeds leases are entitled to be paid royalties on the affiliate-sale or the arm's-length sale, this question would not be common to the entire class.  Accordingly, the Court concludes that this question does not warrant granting class certification.

d.     Conservation fees

Hitch's final proposed common question relates specifically to its claim that Oxy failed to pay 10% interest on the Conservation Fees Oxy refunded to the putative class.  As background, in 2011 the Kansas Supreme Court held in *Hockett v. Trees Oil Company*[45] that Conservation Fees assessed by the Kansas Corporation Commission under K.S.A. § 55-166 is an expense attributable

---

[43] Hitch's Reply did not address this argument.

[44] *Smith v. Amoco Prod. Co.*, 272 Kan. 58, 31 P.3d 255, 268–69 (2001).

[45] 292 Kan. 213 251 P.3d 65 (2011).

to the well operator alone.[46]  After *Hockett* was decided, Oxy refunded Conservation Fees it had

wrongly withheld from the putative class.  Oxy, however, refunded the Conservation Fees without

interest, and Hitch argues that under K.S.A. § 16-201 Oxy's refund should have included interest

at a 10% rate.  Oxy makes two arguments in response to Hitch's fourth proposed common question.

First, Oxy argues that interest on the refunded Conservation Fees is a minor issue in the lawsuit

that should not justify certifying the entire class.  Second, Oxy argues that Hitch's reliance on § 16-

201 is misplaced; Oxy asserts that the correct statute to determine interest on refunded

Conservation Fees is K.S.A. § 55-1615.  Under § 55-1615, Hitch would be entitled to interest at a

rate of prime plus 1.5%.[47]  Additionally, § 55-1615 excludes interest on "[p]ayments which in the

aggregate of 12 months' accumulation of oil or gas proceeds to one payee do not exceed $100."[48]

So, any putative class member that cannot meet this *de minimis* requirement would not be entitled

to interest.

     This Court has already considered and rejected the very argument that Hitch raises here.

In *Roderic*k, the Court rejected the plaintiff's argument that refunded Conservation Fees should

be paid at 10% per annum pursuant to § 16-201; rather, the Court held that K.S.A. § 55-1615

governs interest owed on refunded Conservation Fees.[49]  Hitch asks this Court to reconsider that

decision and hold that § 16-201's 10% rate is the applicable interest rate.  The plaintiff in *Roderick*,

which was represented by the same counsel as Hitch is represented by here, argued that § 55-1615

---

[46] *Id.* at 72.

[47] *See* K.S.A. § 55-1614(h); K.S.A. § 55-1615.

[48] K.S.A. § 55-1614(i)(1).

[49] *Roderick v. XTO Energy, Inc.*, 2016 WL 4039641, at *10–12 (D. Kan. 2016).

applies only to suspended royalty payments, and not to interest on underpayment of royalties. To support this contention, the plaintiff relied primarily on the legislative history for § 55-1614 *et seq.* This Court declined to consider the plaintiff's legislative history argument after concluding that § 55-1615's plain language demonstrated that it was the applicable interest statute for refunded Conservation Fees.[50]

Before the Court considers Hitch's argument that § 55-1615 does not apply in this case, the Court first acknowledges—as it did in *Roderick*—that § 16-201 is a statute with broad applicability that *could* apply to wrongly withheld royalties.[51] Indeed, § 16-201 had been used in such cases in the past.[52] In 1991, however, the Kansas legislature enacted K.S.A. § 55-1614 *et seq.* Section 55-1614 *et seq.* governs interest payments from oil or gas production. In *Roderick*, this Court concluded that while both § 55-1615 and § 16-201 could apply to refunded Conservation Fees, § 55-1615 is the more specific statute and should therefore be applied.[53]

Hitch argues that the Court reached the wrong conclusion in *Roderick*. As part of its argument, Hitch cites the legislative history of K.S.A. § 55-1614 *et seq.* and argues that applying

---

[50] *Id.* at *11–12.

[51] Section 16-201 states:

> Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and for money due from corporations and individuals to their daily or monthly employees, from and after the end of each month, unless paid within fifteen days thereafter.

[52] *Roderick*, 2016 WL 4039641, at *10 (citing *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1, 15–17 (1977) and *Schupbach v. Continental Oil Co.*, 193 Kan. 401, 394 P.2d 1, 6 (1964)).

[53] *Id.* at *12 (agreeing with *Fankhouser v. XTO Energy, Inc.*, WL 4815538, at *1 (W.D. Okla. 2012)).

§ 55-1615 to refunded Conservation Fees would be bad policy. Such arguments cannot sway the Court's decision if the statute's language is unambiguous.[54] In fact, in *Roderick* this Court declined to consider § 55-1615's legislative history because the Court determined that the statute was unambiguous. Like the plaintiff in *Roderick*, Hitch argues that § 55-1615 applies only to interest owed to accounts held in suspense. But the Court finds no support for this argument in the text of the statute and sees no reason to depart from its earlier decision that § 55-1615's plain language makes it applicable to refunded Conservation Fees.[55] In *Roderick*, the Court reasoned:

> Section 55-1614 defines a "payee" as any person "whom payment of revenues accrued from the first sale of oil or gas from an oil or gas well located in Kansas should be made" if the payment arises from "*an interest in the producing property or a contract right to receive*" payment. The [plaintiff] was owed payment of royalties accrued from the sale of gas from its wells located in Kansas pursuant to a lease with [the defendant]. The [plaintiff] is a payee as understood in § 55-1614 *et seq*. A payor is defined as the "first purchaser of production of oil or gas from an oil or gas well." And the first purchaser is the person who owns oil and gas after its severance from the ground. [The defendant] is a payor as understood in the statute. The statute calls for interest at a rate of prime plus 1.5% to be included on "any payment." A payment is "a sum to be paid to a payee by a payor arising from payee's interest in a first sale of oil or gas." Here, [the defendant] (payor) owed the [plaintiff] (payee) a sum pursuant to the [the plaintiff's] royalty interest (payee's interest in a first sale of oil or gas). Section 55-1615 is [therefore] applicable.[56]

The Court does not depart from its analysis in *Roderick* and holds that the same reasoning applies here. Because the Court concludes that the statute's plain language resolves this matter,

---

[54] *Univ. of Kansas Hosp. Auth. v. Bd. of Cty. Comm'rs of Unified Gov't of Wyandotte Cty./Kansas City*, 301 Kan. 993, 348 P.3d 602, 606 (2015) ("[I]n determining legislative intent, the starting point is not legislative history; rather, we first look to the plain language of the statute, giving common words their ordinary meaning. . . . If the plain language of a statute is unambiguous, we do not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it.") (internal citations and quotations omitted).

[55] 2016 WL 4039641, at *11 ("Just because the statute covers suspense accounts does not mean that it would not cover underpayment of royalties as well. The interest rate applies 'on any payment,' whether it be suspended or underpaid royalties.").

[56] *Id.* (internal citations omitted).

the Court will not give any weight to the legislative history, nor will the Court question the Kansas legislature's wisdom in passing this statute. The Court holds that any interest Oxy owes on refunded Conservation Fees is governed by K.S.A. § 55-1615.

Whether Hitch and the putative class are entitled to interest on the refunded Conservation Fees is an issue common to the entire proposed class. However, this issue is so minor and tangential to the rest of Hitch's claims that this lone common question would undoubtedly be insufficient to satisfy Rule 23(b)(3)'s predominance requirement.[57] Furthermore, at the June 5 hearing, Oxy conceded that it still owed interest to Hitch (and other members of the proposed class) for the refunded Conservation Fees pursuant to § 55-1615. So, although this question is common to the entire putative class, it does not appear to be a question that still needs answering. Although Oxy's counsel was unable to explain why Oxy had not yet paid this interest, the Court is hopeful that Oxy will now fulfill its obligation to pay the appropriate interest to Hitch and any other entitled member of the proposed class. If the Court's optimism is misplaced, however, the Court would entertain a motion to reconsider certifying the class solely on this narrow issue.

In sum, the Court concludes that most of Hitch's proposed common questions are not common to the entire putative class. The only question that is common—the interest rate on refunded Conservation Fees—is so minor that even if it satisfies commonality under Rule 23(a), it would be wholly insufficient to tip the scale under Rule 23(b)(3)'s more demanding predominance requirement. Based on these shortcomings, it is unnecessary for the Court to

---

[57] *CGC Holding*, 773 F.3d at 1087 (explaining that "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues") (citations and quotations omitted); *Roderick*, 725 F.3d at 1220 ("We note that Rule 23(b)(3)'s predominance criterion is 'far more demanding' than Rule 23(a)'s commonality requirement.) (quoting *Amchem*, 521 U.S. at 623–24).

determine whether typicality, adequacy, and superiority are met. The Court denies Hitch's motion to certify the class.

**B.      Oxy's Motion for Partial Summary Judgment**

Oxy seeks judgement as a matter of law on three of Hitch's claims. First, Oxy asserts that all breach of contract claims based on Processing deductions taken from July 1, 2007, to January 11, 2013, are barred by the statute of limitations. Second, Oxy asserts that Hitch is not entitled to 10% interest on the refunded Conservation Fees. Third, Oxy asserts that it paid Hitch royalties for all fuel used or lost in the field or at the plant.

*1.      Statute of limitations*

The parties agree that the statute of limitations for Hitch's claims is five years, pursuant to K.S.A. § 60-511. Hitch filed its original complaint in state court on January 11, 2018, so the statute of limitations would ordinarily bar all claims arising before January 11, 2013. Hitch argues that the statute of limitations should be tolled under the doctrine of equitable estoppel because Oxy's check stubs to Hitch falsely represented that Oxy was not taking any deductions for Processing costs. Oxy argues that its practice of taking Processing deductions was clearly discussed in the *Littell* settlement agreement that was sent to Plaintiff in January 2008. So, even if the statute of limitations was tolled beginning in July 2007, Oxy argues that the statute of limitations would have resumed in January 2008 when Plaintiff received the *Littell* settlement agreement.

Oxy provided the following three-part test for equitable estoppel under Kansas law: (1) defendant had material information that the plaintiff did not and have and remained silent about that information; (2) defendant's silence caused the plaintiff not to file a timely suit; and (3) absent a fiduciary or confidential relationship, plaintiff could not have learned of the cause of action

through reasonable diligence.[58]   Oxy argues that Hitch cannot meet the first or third element.  At

the June 5 hearing, Hitch disputed that Oxy's third element (reasonable diligence) is a required

element in Kansas.  It is unnecessary for the Court to rule on this matter, however, because the

Court holds that Oxy is equitably estopped from asserting a statute of limitations defense even if

Hitch was required to exercise reasonable diligence.

a.       Silent about a material fact

Under the first element, Oxy argues that it was not silent about any material fact, pointing

to the Notice of Proposed Settlement Hitch received as a member of the *Littell* settlement class.

The *Littell* Notice of Proposed Settlement stated:

> Nothing contained in the Settlement Agreement is intended to alter or restrict
> OXY's ongoing practice of charging the accounts of its royalty owners with a pro-
> rata share of the fees and costs which it incurs to process the gas in a processing
> plant and to transport it on mainline transmission pipelines under approved FERC
> tariffs, so long as such royalty owners continue to receive the benefits of such
> activities in the form of their allocated share of the proceeds of sale received by
> OXY for the natural gas liquids, helium or other extracted products and the residue
> gas which is sold after such transportation and processing occur.

Oxy argues that even if it had remained silent about its practice of deducting Processing

costs, that error would have been remedied on January 24, 2008 with the *Littell* Settlement Notice.

Hitch, in contrast, argues that Oxy cannot rely on the *Littell* Settlement Notice because Oxy

subsequently misrepresented to Hitch that Oxy was not deducting Processing costs.  As evidence,

Hitch provides a single check stub dated March 25, 2014 ("the Check Stub").  The Check Stub

provides codes that represent specific deductions taken from royalties, including "Processing

---

[58]  *See Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 632–33 (10th Cir. 1993); *Friends Univ. v. W. R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936, 941 (1980).

Related Fees," "Gathering/Compression" fees, and "Transportation" fees. The Check Stub shows that deductions were taken for "Gathering/Compression" and "Transportation" fees but not "Processing Related Fees." Yet, Oxy does not dispute that it did take deductions for Processing costs during this period. While the Court agrees with Oxy that this one check is not necessarily indicative of Oxy's practice across the entirety of 2007–2014, Oxy has not provided any other check stubs in which it accurately reported to Hitch that it was taking deductions for Processing costs. Construing the facts in favor of the nonmoving party, the Court concludes that Hitch has sufficiently raised a triable issue that Oxy was silent about a material fact.

               b.       Reasonable diligence

Whether Kansas imposes on Hitch a requirement that it perform reasonable diligence before asserting an equitable estoppel defense is a point of contention in this case. Nevertheless, even assuming that reasonable diligence is a required element, the Court holds that Oxy is equitably estopped from raising a statute of limitations defense against Hitch.

Oxy argues that this case is virtually identical to *Freebird, Inc. v. Merit Energy Co.*[59]—another case involving underpayment of oil and gas royalties. In *Freebird*, the plaintiffs argued, among other things, that the defendant was improperly deducting GCDTP costs, and that the defendant was silent as to that fact. The plaintiff provided a sample check stub showing that the defendant deducted a "distribution fee" every month but did not describe what was included in the "distribution fee." Evidently, the fee included Compression, Gathering, and/or Transportation costs.

---

[59] 883 F. Supp. 2d 1026 (D. Kan. 2012).

The court in *Freebird* noted that "[e]ven though defendant's check stubs did not include all information which plaintiff claims was relevant, plaintiff has not shown that due diligence could not have led it to discover the facts which gave rise to its causes of action." [60]  The court pointed out that K.S.A. § 55–1622(a)(5) "specifically gives royalty owners a right to detailed information about their leases, the wells on their land and their royalty payments, including 'the amount and purpose of any other deductions or adjustments from the royalty owner's share of the sale of oil and gas not identified on the payment statement.' "[61]  Because the plaintiff never requested this information, the court held that the plaintiff had not produced evidence that raises a genuine issue of material fact whether, exercising due diligence under K.S.A. § 55–1622, the plaintiff could not have discovered the facts that give rise to this cause of action.[62]  Oxy argues that Hitch could likewise have requested detailed information about its lease pursuant to K.S.A. § 55–1622 and that Hitch has not demonstrated that it could not have discovered the facts giving rise to its claim had Hitch exercised due diligence.  Oxy argues that Hitch should have been aware that Oxy was taking Processing deductions because of the *Littell* Settlement Notice and Hitch failed to exercise diligence to find out what deductions Oxy was taking.

Hitch argues that *Freebird* should be distinguished from this case.  Hitch notes that in *Freebird* the check stub merely omitted detailed information about the specific deductions taken by the defendant; whereas here, Oxy stated that the Check Stub would reflect any Processing Related Fees.  Hitch argues that it was reasonable for Hitch to rely on Oxy's representation on the

---

[60] *Id.* at 1037

[61] *Id.* (citing K.S.A. § 55–1622(a)(5)).

[62] *Id.*

Check Stub that no Processing Related Fees had been deducted. The Court agrees. What constitutes reasonable diligence must be based on the circumstances. Had Oxy remained silent or been vague about what deductions it was taking, then perhaps Hitch should have inquired further. But Oxy represented to Hitch that its check stubs would reflect any Processing deductions, and the Check Stub informed Hitch that no Processing fees were deducted from its royalties. Oxy has suggested that all royalty owners have a general obligation to inquire into the details of their leases. While this may be prudent advice, the Court will not impose on Hitch a requirement that it verify the veracity of Oxy's check stubs. Instead, the Court holds that it was reasonable for Hitch to take Oxy at its word and Oxy is equitably estopped from asserting a statute of limitations defense. Oxy's motion for summary judgment on all claims prior to January 11, 2013, is therefore denied.

2.    *Conservation Fees*

Oxy seeks summary judgment on Hitch's claim that it is entitled to 10% interest on Oxy's refunded Conservation Fees. As the Court addressed above, Hitch is not entitled to 10% interest. Rather, pursuant to K.S.A. § 55-1615, Hitch is entitled to an interest rate of prime plus 1.5%. Oxy's motion for summary judgment on Hitch's claim for 10% interest is therefore granted.

3.    *Plant and Field Fuel*

Oxy argues it is entitled to summary judgment on Hitch's claims for fuel used or lost in the field or at the plant, asserting that it paid royalties on this fuel. At the June 5 hearing, it became clear that the parties' positions on this matter are not in conflict. Understanding why requires a brief overview of how the putative class gas journeys from the individual wells to its final sale. First, the gas is extracted at the wellhead. Next, the gas is placed in the OneOK Gathering System and Compressed. The Gas is then comingled in the WTG Hugoton and NNG Pipelines and transported to the Jayhawk Processing Plant, after which the Residue Gas, NGLs, and Helium are

sold.  Oxy is seeking summary judgment only on the fuel used or lost *before* the gas enters the WTG Hugoton Pipeline and *after* it leaves the NNG Pipeline at the Jayhawk Processing Plant. Oxy is not seeking summary judgment on fuel used or lost on the WTG Hugoton/NNG pipelines. Hitch explained that it is only bringing a claim for fuel used or lost on those pipelines, and therefore does not contest Oxy's request for summary judgment.  As this is no longer a contested issue, the Court grants Oxy's request for summary judgment on this matter.

## C.    Motions to Strike

As a final matter, Hitch has provided a sworn declaration by its attorney, Rex Sharp, and an expert report prepared by Daniel Reineke in support of its Motion for Class Certification. Similarly, Oxy has provided expert reports prepared by John McBeath and Stephen Becker in opposition to class certification.  In Oxy's Response brief opposing class certification, Oxy objected to the Sharp declaration and the Reineke report and requested that the Court strike both; for clarity, Oxy did not file a separate motion to strike.  Hitch, conversely, filed a separate motion to strike McBeath and Becker's reports and to preclude their testimony at trial.

Both the Reineke Report and the Sharp Declaration were attached in support of Hitch's Motion for Class Certification.  Because the Court holds that the putative class should not be certified on grounds unrelated to the Reineke Report and Sharp Declaration, it is unnecessary for the Court to rule to on these objections.  The Court therefore denies them as moot.

Hitch urges the Court to strike the McBeath report for two reasons.  First, Hitch states that McBeath "focuses on house gas and irrigation gas, which are not within the definition of the [Putative] Class and are, thus, irrelevant to this case."  Second, Hitch states that McBeath opines "that the gas produced from the [Putative] Class Wells can be in marketable condition before its sale to a purchaser in a good faith transaction" which contravenes the holding in *Fawcett*.  As the

Court addressed above, irrigation gas and house gas are relevant to this case despite Hitch not seeking to recover any damages related to the irrigation or house gas, as they are evidence of the gas's marketability. Relatedly, the Court disagrees with Hitch's reading of *Fawcett* and holds that gas may be marketable before a good faith sale, so McBeath's opinions do not contravene Kansas law. For these reasons, Hitch's Motion to Strike the McBeath Report is denied.

Hitch objects to the Becker Report because it invades the province of the Court by providing legal opinions. One of the ways in which Hitch asserts that Becker provides legal opinions is his statements on the content of the putative class's leases. Oxy relied on Becker's Report in arguing that the Court would need to undergo a lease-by lease-analysis, thereby destroying commonality. As the Court addressed at the June 5 hearing, the Court is skeptical of Oxy's position that a lease-by-lease analysis would be necessary at trial; and this argument did not factor into the Court decision to deny class certification. Neither was the Court swayed by any legal interpretations Becker provided on the *Littell* Settlement Agreement or on the significance of *Fawcett*. At trial, the Court will perform its gatekeeper function to ensure that the jury is not presented with improper expert witness testimony. The Court denies Hitch's Motion to strike the McBeath Report and the Becker Report.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Class Certification (Doc. 33) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Oxy USA Inc.'s Motion for Partial Summary Judgment (Doc. 66) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Expert Reports of John C. McBeath and Stephen L. Becker and to exclude their testimony (Doc. 57) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 16th day of July, 2019.

Eric F. Melgren

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE